Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through their Pre-trial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. On or about 22 December 1994, an employment relationship existed between plaintiff and defendant-employer.
3. Amerisure Companies was the workers' compensation carrier on the risk for Defendant-employer.
4. According to the Form 22, plaintiff's average weekly was $172.83, and plaintiff's weekly compensation rate, pursuant to G.S. § 97-1 et seq. would be $115.19.
5. Plaintiff's claim for exposure to gas on 22 December 1994 was accepted as compensable under an IC Form 21 Agreement for Compensation for Disability which was approved by the Industrial Commission on 3 July 1995. Pursuant to that Form 21, plaintiff was paid temporary total disability benefits from 30 December 1994 through 3 January 1995. A Form 28B was filed in this matter on 26 May 1995 and plaintiff's last payment of compensation was forwarded to her by defendant on 26 May 1995. The parties agreed that the Form 28B dated 26 May 1995 was received into evidence.
 *************
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is a female who was born on 3 December 1969. She dropped out of high school in the eleventh grade. Plaintiff is married with three children. Plaintiff began working for defendant-employer in September 1994 and last worked for defendant in September 1995.
2. On 22 December 1994, plaintiff reported to work at about 7 a.m. Shortly thereafter, plaintiff began to notice the odor of gas. She and the other employees were evacuated from the plant around 7:30 a.m. Plaintiff walked outside, where she talked with other employees. Plaintiff began to have breathing difficulties and sat down on a bench. She briefly passed out. Emergency medical services were called to the scene.
3. When the emergency medical technicians arrived at about 7:44 a.m., plaintiff was breathing on her own, with respiration of 12, which is normal. During the trip to the hospital, plaintiff had what appeared to the emergency medical technician to be a seizure. However, this was not a true "seizure," as plaintiff was able to communicate, and complained of chest pain. During a true seizure, a person is unconscious and unable to communicate. Following a seizure there is a period of time when the person appears to be asleep. However, when plaintiff reached the emergency room at Swain County Hospital, she was alert and complaining of a headache.
4. After being seen at the emergency room, plaintiff was admitted and seen by her physician, Dr. Marcus Williams. Upon plaintiff's admission, Dr. Williams noted that she was in "minimal distress." Her chest x-ray was normal, with no evidence of infiltrates, and her physical examination was normal. An EKG showed a normal sinus rhythm. Blood gas studies were also done. Dr. Harris and Dr. Ford both testified as to the significance of the blood gas results. Plaintiff's blood gas pH of 7.439 and PCO2 (the carbon dioxide level) of 31.8 both indicate that plaintiff had been hyperventilating, which would cause her to lose consciousness briefly. By breathing so rapidly, she had blown off carbon dioxide. Her PO2 (oxygen level) of 264.2 was high. The blood gas results, as well as plaintiff's physical condition upon her admission, show plaintiff was not in acidosis and was not hypoxic, which requires a PO2 of less than 60. Dr. Williams' final assessment at that time was propane inhalation and syncope.
5. On 22 December 1994, while in the course of her employment with defendant, plaintiff was exposed to an unknown concentration of gas, which contained Ethanethiol, the ingredient which gives gas its odor. This exposure lasted at most for approximately 30 minutes, from the time plaintiff arrived until the plant was evacuated about 30 minutes later. Due to this exposure, plaintiff developed some temporary respiratory distress and hyperventilated. As a result, she needed medical care, which was rendered immediately by the EMS team and at Swain County Hospital. Plaintiff was released from Swain County Hospital on 24 December 1994.
6. Plaintiff returned to work in her regular job for defendant at the same pay on 3 January 1995. There were no medical restrictions placed on her at that time. Plaintiff continued to work in her regular duties. Although she complained to Dr. Williams over the next few months that she was tired and on one occasion said she had difficulty getting her breath, she did not have any significant problems until September 1995.
7. On 13 September 1995, Plaintiff was seen at the office of Dr. Williams with complaints of hoarseness and cough and difficulty breathing. She was assessed with asthmatic bronchitis. Plaintiff reported to Dr. Williams' office again two days later with complaints of shortness of breath and he admitted her to the hospital that day, September 15. According to Dr. Williams, this was a recurrent episode of wheezing and shortness of breath, similar to the initial episode on the day of the gas exposure, but not as severe. His assessment was a chronic obstructive lung disease with acute exacerbation. Plaintiff was discharged from the hospital on 21 September 1995. Following her discharge, as of 27 September 1995, Dr. Williams released plaintiff from work for three weeks.
8. Dr. Williams' specialty is internal medicine, and he is not a pulmonary specialist. It is his opinion that plaintiff was exposed to gas on 22 December 1994, which caused an aggravation of some underlying obstructive lung disease. He is of the opinion that plaintiff had a prolonged reaction to the initial exposure, but he did not expect any permanent damage as a result of the exposure.
9. Before 22 December 1994, plaintiff received medical treatment for many of the same symptoms she now attributes to the incident of 22 December 1994. On 8 January 1986, plaintiff was admitted to Memorial Mission Hospital due to a syncopal episode, in order to rule out a seizure disorder. Upon her hospital admission, plaintiff reported she had suddenly become dizzy at school and had then lost consciousness. She reported she had experienced these dizzy spells before. An EEG was normal and no neurological basis for the episode was found. Plaintiff was discharged with a diagnosis of conversion reaction and anxiety neurosis. With a conversion reaction, an individual develops physical symptoms due to some underlying psychological cause or trauma, rather than due to a physical injury.
10. In 1987, plaintiff was seen at Smoky Mountain Area Mental Health for complaints of depression, difficulty sleeping and eating, anxiety, and suicidal thoughts. She made allegations of inappropriate physical contacts by her father, which she later recanted. It was noted that plaintiff fit the profile of an individual who seeks secondary gain based upon physical symptoms.
11. Plaintiff has a history of upper respiratory complaints, such as sinus problems, and congestion. In January 1989, plaintiff was seen at Swain Medical Center with complaints of headaches, and a chest cold with cough and sinus congestion. She was seen with headache complaints again on 9 May and 8 June 1989. In August 1991, she was seen again with congestion in her nose.
12. On 30 November 1991, plaintiff was seen at Swain Medical Center with complaints of aching all over, and she fainted in the lobby. In May and June 1992, she was seen for complaints of congestion and sinus problems.
13. On 25 July 1994, when she was seen at Swain Medical Center with complaints of cough and congestion, plaintiff was assessed with bronchitis. Shortly thereafter, plaintiff came under the care of Dr. Marcus Williams, an internal medicine specialist who became her general physician. On 28 November 1994, Dr. Williams saw plaintiff with complaints of a migraine headache for five days.
14. On 18 November 1996, plaintiff was seen by Dr. T. Reginald Harris, a board-certified pulmonary expert, who is a member of the North Carolina Industrial Commission's Occupational Disease Panel. Dr. Harris reviewed her previous records and performed an extensive evaluation. Pulmonary function tests were normal and a chest x-ray was normal. Dr. Harris found no evidence of asthma, or obstruction or restriction. Treatment with an inhaler or bronchodilator, actually made plaintiff's condition worse, which confirmed there was no asthma or obstructive disease. Dr. Harris found no evidence of any lung disease and no evidence of any permanent injury. He concluded that plaintiff did not have any significant lung disease and could work without any restrictions.
15. From reviewing plaintiff's prior medical history, Dr. Harris is of the opinion that plaintiff did not suffer hypoxia during her initial gas exposure. The blood gas results confirmed this conclusion. Hypoxia occurs when the gas displaces oxygen and brain damage can occur. However, plaintiff's blood work showed high levels of oxygen in her blood. Dr. Harris also found that the symptoms she displayed during her hospital admission in September 1995 and in a later admission in June 1996, were not consistent with an asthma attack. Her complaints were consistent with hyperventilating which can be associated with anxiety.
16. Plaintiff's medical records have also been reviewed by Dr. Marsha Ford, a medical doctor and Director of the Toxicology Division at Carolinas Medical Center. Dr. Ford agrees with Dr. Harris that plaintiff did not suffer hypoxia on her initial exposure. Both Dr. Harris and Dr. Ford agree that there are no medical studies which show any long term effects from exposure to gas consistent with plaintiff's limited exposure, particularly where there is no indication of hypoxia. Dr. Ford is of the opinion that plaintiff's ongoing symptoms are unrelated to the exposure of 22 December 1994, and that plaintiff has no permanent injury or restriction.
17. Plaintiff consulted Andrew Paul Mason, Ph.D., a forensic toxicologist, for an independent opinion as to plaintiff's exposure and the consequences. Dr. Mason is not a medical doctor. Dr. Mason noted that gas in high concentrations is an upper respiratory irritant. It is his opinion that plaintiff's exposure did aggravate her condition. However, Dr. Mason admitted he did not know the quantity of gas involved in plaintiff's exposure, and that the studies he based his opinion on with regard to long-term effects of propane exposure all involved individuals with prolonged deliberate exposure to gas, such as attempted suicides and persons who were trying to get "high". In rendering his opinion, Dr. Mason was also unaware of plaintiff's prior history of respiratory complaints, seizures, and anxiety disorder and conversion disorder, and acknowledged that such a history could affect his assessment.
18. Plaintiff has also been seen by Dr. David Zimmerman, who is in general practice. Dr. Zimmerman had seen plaintiff before the accident for upper respiratory problems and flu-like symptoms. Dr. Zimmerman agrees with the assessment of Dr. Harris that if the bronchodilator did not help plaintiff, it indicates there is in fact no restriction or obstruction.
19. In weighing the medical evidence as to the effects of plaintiff's exposure to the gas, the Full Commission has given the most weight to the testimony of Dr. Harris and Dr. Ford. Both are experts in related fields. Dr. Harris also had the benefit of a complete first-hand physical evaluation of plaintiff. The testimony of Dr. Mason has been given less weight, due, in part, to the fact that he is not a medical doctor and is not the best qualified expert to assess the effects of the exposure on plaintiff's physical condition. Dr. Mason was also unaware of some of plaintiff's medical history. This medical history was significant in assessing plaintiff's pre-existing condition and her veracity. In reaching his conclusions as to the long-term effects of gas exposure, Dr. Mason also relied upon circumstances which do not appear applicable to plaintiff's particular exposure. Dr. Williams' testimony is considered relevant to any temporary respiratory distress experienced by plaintiff. Ultimately, however, Dr. Harris and Dr. Ford are the best authorities as to any permanent consequences.
20. On 18 January 1997, plaintiff was evaluated by Dr. Gerald Aronoff, who is board-certified in psychiatry. At that time, Dr. Aronoff did not find her to be anxious or depressed. He found plaintiff did not suffer from post traumatic stress disorder (hereinafter "PTSD"). He was of the opinion that plaintiff's respiratory problems might be a somatoform process; that is, they are not caused by a physical disorder, but have a psychological basis. Dr. Aronoff found plaintiff was not disabled from working from a psychological standpoint.
21. On 1 February 1996, plaintiff was seen by Nancy DeBord, a clinical social worker, with a Masters degree in psychology. DeBord assessed plaintiff with PTSD, based upon plaintiff's reported symptoms, including nightmares, poor sleeping, flashbacks, and depression. However, in her testimony, DeBord admitted she only saw plaintiff on this one occasion for about an hour and a half and that she did not know anything about the incident of 22 December 1994 except what plaintiff told her. DeBord acknowledged that she was not familiar with the criteria for PTSD set forth in the DSM-IV.
22. In weighing the evidence as to any psychological consequences from the accident of 22 December 1994, the Full Commission has given more weight to the testimony of Dr. Aronoff than to that of Nancy DeBord. Dr. Aronoff is a board-certified psychiatrist who is familiar with PTSD and is in a better position to assess whether plaintiff suffers from PTSD. The greater weight of the credible evidence in this regard fails to establish that plaintiff developed PTSD or any other long-term disabling psychological consequences as a result of the incident of 22 December 1994.
23. Other than the period immediately following the accident of 22 December 1994, and the period during September 1995 when, according to the testimony of Dr. Williams, plaintiff was released from work during and immediately following her hospitalization, the evidence fails to establish that plaintiff's accident of 22 December 1994 has resulted in any impairment of her wage earning capacity. Plaintiff has reached maximum medical improvement and has not sustained any long-term or permanent lung injury, and she does not suffer from any pulmonary disease which has been shown to be attributable to the injury by accident.
24. Since September 1995, plaintiff has not returned to work for defendant and there is no evidence that she has attempted to find work with any other employer. However, the evidence fails to establish that she is unable to engage in gainful employment as a result of her accident.
 *************
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 22 December 1994, plaintiff sustained an injury by accident arising out of and in the course of her employment, when she was briefly exposed to an unknown quantity of gas. N.C. Gen. Stat. § 97-2(6).
2. As a result of the accident on 22 December 1994, plaintiff developed temporary respiratory distress and required medical treatment. Defendants are responsible for payment for all medical care which was reasonably necessary to effect a cure or give relief or lessen any period of disability, including plaintiff's initial hospitalization and her follow-up with Dr. Williams in 1994 and 1995. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. As a result of the accident on 22 December 1994, plaintiff was temporarily totally disabled from 22 December 1994 through 2 January 1995. Defendants have paid temporary total disability benefits during this period from 30 December 1994 through 3 January 1995. N.C. Gen. Stat. § 97-29.
4. As a result of the accident on 22 December 1994, plaintiff was temporarily totally disabled from 15 September 1995 and continuing through 18 October 1995. Plaintiff is entitled to temporary total disability benefits during this time. N.C. Gen. Stat. § 97-29.
5. The evidence fails to establish that plaintiff was incapable of returning to gainful employment after 18 October 1995. As plaintiff has made no effort to return to work for defendant or any other employer, no further benefits are due. N.C. Gen. Stat. § 97-29; Russell v. Lowes, 108 N.C. App. 762,425 S.E.2d 454 (1993).
6. Plaintiff has reached maximum medical improvement, and the evidence fails to establish that she has sustained any permanent physical or psychological impairment as a result of the accident on 22 December 1994. N.C. Gen. Stat. § 97-31.
7. Plaintiff failed to prove by the greater weight of the evidence that her 22 December 1994 injury by accident caused or significantly contributed to any emotional or psychological problems suffered by plaintiff.
 *************
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred by plaintiff as a result of her injury by accident of 22 December 1994, including the initial hospitalization and that of September 1995, as well as the treatment rendered by Dr. Williams during that time period. Defendants shall pay for the independent assessments previously made by Dr. Harris and Dr. Aronoff. Defendants are not responsible for any ongoing medical expenses, as the same have not been shown to be reasonably related to plaintiff's 22 December 1994 injury by accident.
2. Defendants shall pay plaintiff compensation at the rate of $115.19 from 22 December 1994 through 2 January 1995 and from 15 September 1995 through 18 October 1995, as temporary total disability benefits. This amount is subject to a credit for amounts already paid by defendants during this period.
3. A reasonable attorney's fee of twenty-five percent of the net compensation awarded plaintiff herein is approved for plaintiff's counsel. Twenty-five percent of the compensation due plaintiff shall be deducted therefrom and paid directly to her counsel.
4. Defendants shall pay the costs.
 S/ ________________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ ______________________ THOMAS J. BOLCH COMMISSIONER